Call the next case. Case number 061772, Pico v. Clyde-Williams. Half blood and half police. Are you in here when I gave the instructions, the two lawyers? Yes, Your Honor. Okay, you'll each have 15 minutes. You may begin after the room settles down. Why don't you both identify yourself? Let's do that. I'm Pete Sgro for the appellant, Clyde-Williams. I'm sorry. Pete Sgro. How do you spell that? S-G-R-O. Okay. I'm Assistant State's Attorney, Mike Shalounis, on behalf of the people of the State of Illinois. Okay. You may begin. May it please the Court. Your Honors, when Clyde-Williams accompanied the police to the station on October 17th at about 5 p.m., they did not have probable cause for an arrest. And while this initial encounter may have been voluntary, it evolved into a full-blown arrest. And at the time he was in custody, the police still did not have probable cause. So, accordingly, the statement that he eventually gave sometime 48 hours or more after he went to the police station was the fruit of this illegal arrest, and the trial court erred by not suppressing the statement. Are you saying that no discussion was had prior to the evening that he allegedly was staying there? Are you saying he said nothing? No, there were several statements. Yes, there were several statements. The statement that we're arguing should have been suppressed was the confession he eventually gave to the Assistant State's Attorney. But he did disclose knowledge of the events surrounding the murder prior to that evening. Well, I think if you're looking at the different conversations, there was the first conversation which took place at 5.30. He did not disclose any knowledge of the crime. He did disclose that he knew. Was present. But not at the crime. He was present with Walter and Sylvester sometime on October 18th, but not present at the crime. No, he does not admit that at 5.30 or at 11.10 p.m. either. His first statement admitting any knowledge or presence of the actual crime was the next morning, well, next afternoon at 12 p.m. So, there are statements that he was with Walter and Sylvester, but they're very vague as to the time. We don't really know when exactly this crime took place. So, I don't think that those statements, the first two statements. But we do know he was there. At the crime? Well, in a sense, we do know by after the fact, but we also know that prior to the end of the evening that he was there. We know that he was with them sometime on October 18th. Yes, Your Honor. I don't think that we know anything about. You're saying you don't know when that ended. Exactly. At the time that he was legally in custody, we don't know anything about his presence during the commission of this crime. We know that he was with Walter and Sylvester sometime on October 18th. That doesn't really narrow it down. He doesn't admit any knowledge. So, I guess to answer your question initially, the initial conversation he gave at 5.30 p.m. I would not argue needed to be suppressed. We're speaking about the conversation. No, I know what you're saying is suppressed, but I'm saying maybe they're joined. That they never, it's just an ongoing situation. Well, I don't think that, I guess if we're getting into probable cause here, these statements I don't think came close to rising to the level of probable cause. The statement that he, I mean, if you look at some cases I cited in my opening brief. I've read them. Okay. I mean, just even much more in say, People v. Hamer, where the defendant, the suspect admitted being at the crime scene with the defendant, and his car was also at the crime scene, and he failed to polygraph. But they still held that's not enough for probable cause to arrest, because there has to be something more relating to commission of that crime. And so, in this case, where we have much less than Hamer, we don't even have anything of any of these statements on October 17th that even discuss the crime. So, I don't think that we have any, you know, the fact that he was with them sometime on the 18th does not rise to the level of probable cause. But they also did have other people place him there. People placing him not at the crime itself, the occurrence of the crime. But, yes, you have, well, Walter McGowan doesn't say anything about Ock Clyde and Mr. Williams. But then Sylvester says they were together sometime on the 18th. Like I said, it's not very clear exactly. But that statement that they obtained from Sylvester McGowan sometime on October 16th, I believe. He never says anything about Clyde was at the crime, Clyde witnessed the crime, I witnessed the crime. In fact, I don't think he mentions the crime at all. Most he says is he was there, and he saw him cleaning the apartment. Now, I don't think, you know, cleaning an apartment is probable cause to arrest someone. I think what you have here is there was information the police received about Walter McGowan. But probable cause has to be particularized to an individual. You can't bootstrap probable cause that, you know, someone called up and said Walter McGowan might have been involved to Mr. Williams without more than the fact that he was with him sometime around the date that we think this crime probably occurred. So, yeah, I think that it's clear that he was in custody when they left him to spend the night at 11, 10 p.m. on the 17th. Wasn't there evidence that Mr. Williams was able to leave the room to go use the vending machine and use the washroom and get packed and the door was not locked? Well, they said the door was left closed. Now, he did say he ate from the vending machine, but I don't think the record suggests that he was, like, free to wander around the police station. I think, you know, we're talking about a detention that takes place over 48 hours. Of course he's going to be given some food. And the fact that he got some food from the vending machine would not suggest that this somehow was not – he was not in custody. In fact, I would imagine if you're free to leave and you're hungry, you might want to go home or you might want to – just as you would not want to spend the night in an interrogation room if you were free to leave, your choice for dinner may not be something from a vending machine while you get to spend the night in the interrogation room. So I don't think that one fact alone would suggest. And we also don't know – that just came about in cross-examination after – when Mr. Williams testified that he was kept in the interrogation room, that, you know, he was denied his rights. And on cross-examination, he did say he got some – he ate from some food from the vending machine. But I don't think that one factor would change this from what Illinois courts, you know, like people of young have clearly held. Spending the night in an interrogation room means you are no longer free to leave. It's an absurd notion that someone would choose to spend the night. So I think, yes, it's clear that once he was left to spend the night – and he was never told he was free to leave despite the fact that they Mirandized him and questioned him and he did not admit involvement in this crime, which is, of course, a factor. And the reading of Miranda rights is also an indication of arrest. So, I mean, everything that happened from the time he was taken to the station just made clear that he was not free to leave. And it's whether a reasonable person in the suspect's position would believe he was free to leave. So I think it's, you know, the first factor is was he in custody? Yes, he was in custody when they left him to spend the night. At that time, did they have probable cause? And it's clear that they did not have probable cause. They had at most a hunch that because he maybe was with them sometime on the day that they think this crime might have occurred. And also, we don't – the police at that time did not really know when this crime had occurred. They had talked to Walter – Andre Smith, who called in about Walter McGowan and his girlfriend, and said that she heard a cry in the – you know, somewhere in the building sometime between September 18th and October 15th. So it's not exactly narrowing down the timeframe either. So this murder took place about 30 days before the arrest. Yes, Your Honor. And so all the evidence that the state cites in its brief basically points to either Walter McGowan or describes innocent conduct. You know, cleaning the apartment, like I said, that doesn't really constitute probable cause. So I think if – you know, when reading the state's brief, another point I'd like to make is they discussed that the police needed to keep him in a secure area so they could maintain – know where he was for questioning as they went about their investigation. Well, this is precisely what courts do not want to encourage, arresting without probable cause and then embarking on an investigation to try to turn up evidence to justify that detention. And so I think by maintaining that they needed to keep him in a secure area, basically they're admitting that they kept him without probable cause as they tried to justify this detention, which I think leads us to the last question is whether this should be suppressed. The statement is the fruit of this illegal arrest, and I think it's clear that it should because this is exactly what the courts have said the police should not do. And a lengthy detention without probable cause, where they eventually get a statement, is – that statement cannot be said to be attenuated from the illegal arrest. And so therefore, the trial court erred when it did not suppress this confession. If Your Honors have no more questions, I would like to reserve a couple minutes for rebuttal. That's fine. Thank you. Good morning, Your Honors. Once again, I am Micah Schlounis on behalf of the people of the state of Illinois. May it please the Court, despite defendant's contentions, the people maintain that prior to the police's approach to Clyde Williams on their late afternoon hours of October 17th, 2004, there exists a probable cause to believe that a crime had been committed and the defendant was involved in the commission of that offense. At the defendant's hearing on the motion to quash arrest, there was a sole witness, Detective Johnson. His unrebutted testimony established the following facts. That prior to the approach of the defendant on October 17th at 5 p.m., the police knew that a victim had been discovered in the basement of a building where he lived, that blood was found outside of the co-defendant's apartment. The co-defendant initially denied knowing the defendant and directed the police to his brother, Sylvester. Sylvester then stated that the defendant and co-defendant were together in the apartment, partying and snorting heroin on or about September 18th. This statement led the police to produce a photograph of an individual who was identified by Sylvester McGowan as Pumpkin. Pumpkin was positively identified by Sylvester McGowan as the defendant, Clyde Williams. The police then took the defendant's photograph to the co-defendant, who then changed his story and admitted the defendant was present in the apartment on or about September 18th. Sylvester McGowan also told the police the defendant was there cleaning, in addition to snorting heroin. While the defense would have you examine these statements in a vacuum, it's true the defendant was in the apartment cleaning, and there is no suggestion as to what the nature of the cleaning was, as was pointed to by the trial court. However, after listening to the detective and knowing that these statements must be given in totality of the circumstances, based on the reasonable beliefs of a police officer, the trial court adjudged that cleaning an apartment in connection to blood found inside and outside of the apartment, a victim discovered in the basement of that same apartment building that was covered with trash and refuse, did not carry himself down to the basement. We're talking about a crime that involved at least two people. The defense also states the defendant was in custody for 48 hours before he made an inculpatory statement. This is simply not true. The defendant's first inculpatory statements came less than 24 hours after he was in custody, when he placed himself at the crime scene on or about the day of the victim's death, witnessing the beating death of the victim. Is this... you know, I don't have the record, but what I'm saying is this took place before he stayed overnight. Prior to the overnight, there were two interviews at the station, 5 and 11 p.m. During those particular interviews, no inculpatory statements were given by a defendant, but the police knew that the body was discovered in a basement, where defendant and co-defendant had been in the apartment on or about the time the victim went missing, and the body somehow ended up in the basement. When the detective testified that he was placing defendant under formal arrest, which was more than two days before formal charges were laid, he said he was arresting defendant for the concealment of a homicidal death, not for first-degree murder. Concealment of a homicidal death in that the body was found in the basement of a building covered with cash and refuse, and that blood evidence was cleaned from the outside of the co-defendant's apartment and from the interior. So the probable cause the police possessed prior to the defendant spending the night in that station was that a death had been concealed and that people were involved in its concealment. They had reason to believe that co-defendant was imminently involved in the death, and he was actually charged prior to defendant's formal arrest on the 18th, in the commission of the actual murder. So the information that was possessed of the detectives led them to believe that defendant was involved in the concealment of a homicidal death prior to the giving of his inculpatory statements on the evening of October 18th. Once those statements were given, the police certainly had probable cause to arrest defendant for the concealment of a homicidal death, as he admitted to carrying the body down the stairs and to cleaning blood out of the co-defendant's apartment on or about September 18th. Now, the defense counsel states that there is not an exact timeline for when the victim died. The timeline is provided by defendant himself, who was released from jail September 17th, subsequently stated to the police that he spent the night in the co-defendant's apartment on the evening of the 17th, and was there on the day of the 18th, drinking and farting with co-defendant and two of his brothers. So that's how the date of the September 18th came about. Additionally, people like to point to the fact that blood was discovered outside the co-defendant's apartment. The co-defendant places defendant in the apartment prior to their approach of defendant on the street, prior to him spending the night at the police station. The defendant's accompaniment to the police station was voluntary and uncontested, and also that defendant maintains the burden in the motion to cross-arrest, and the testimony of the detective went unrebutted. Any further questions? For these reasons and those contained in the people's brief, we ask that you affirm the trial court's dismissal of the motion to cross-arrest and defendant's sentence and conviction for first-degree murder. Thank you. Your Honor, I'll be brief. The State is pointing to a conversation that took place after he had spent the night in jail, and even that one wasn't really an inculpatory statement, but he admitted knowledge of this crime, not participation. But even that, you would have to believe that he was not in custody when they left him to spend the night in an interrogation room with the door closed. It's clear that he was in custody, so this statement that happened after this had evolved into an illegal arrest cannot be used to justify what happened prior to this statement, as it's clear that only properly obtained evidence can be used to attenuate a statement that's later obtained. So this statement was also the fruit of the illegal arrest and cannot be used to justify it. Let me ask you one. You mentioned that he went to the vending machine and ate. Was that before the day ended or the next day after he had spent the night there? I don't believe the record establishes exactly what time he ate food from the vending machine. What time was he brought in again? At 5 o'clock, he was brought to the station on October 17th and placed in an interrogation room immediately when he got there at 5.30 p.m. And the detectives testified that they left him in that interrogation room with the door closed until 11.10 p.m. And the detective never testified that he allowed him to go out and get food. It suggests that he stayed in there. Then he came back at 11.10, interrogated him again, and then left him again with the door closed. So while the record is not exactly clear, I don't think it establishes that he went to the vending machine on his own, like freely, any time during his encounters on that 17th. Okay. All right. Thank you, Your Honor. Thank you. It was an interesting case. Both sides did well. We'll let you know.